## QUATTLEBAUM v. BLACK.

1. In action for foreclosure, two parties were made defendants on the vague ground that they "claimed an interest in the land." One of these defendants admitted the allegations of the complaint, but asserted a claim which raised an issue with his co-defendant only. *Held*, that such claim could not be properly adjudicated in this action, and that this was not a case that authorized a decree between co-defendants.

2. Where a mortgagee entered upon the record of his mortgage in the proper office a receipt, upon the faith of which money was lent to the

mortgagor, the correctness of such entry cannot afterwards be questioned, not only as against the party so lending and those claiming under him, but also as against subsequent purchasers of the mortgaged land.

Before COTHRAN, J., Edgefield, June, 1884.

This was an action by R. H. Quattlebaum against J. C. C. Black, assignee of R. H. May & Co., and others. The opinion sufficiently states the case.

*Mr. B. W. Bettis, jr.,* for plaintiff.

*Messrs. Sheppard Bros.,* for O. O. Barr.

*Messrs. A. S. Tompkins* and *Ernest Gary,* for J. W. Tompkins.

December 5, 1885. The opinion of the court was delivered by

MR. JUSTICE McGOWAN. This was an action to foreclose a mortgage against J. Wesley Barr under the following circumstances : On July 13, 1872, the said Barr executed a note to the plaintiff for $7,500, and to secure it executed a mortgage of five hundred acres of land, which was duly recorded. Quattlebaum removed to Orangeburg, but about March 1, 1873, he returned to Edgefield, and certain negotiations were had in reference to taking up the mortgage. Warren, Wallace & Co. of Augusta were the factors of J. W. Barr, and they were appealed to. The parties were present at Edgefield on March 1 and 3, and L. W. Carwile, the agent in Edgefield for Warren, Wallace & Co., was with them ; for there is on the original mortgage, in the handwriting of Carwile, but signed by Quattlebaum, an indorsement in these words : "I acknowledge the receipt of fifty-one hundred dollars on the within mortgage. This 1st of March, 1873," and the same amount is acknowledged and entered by Quattlebaum on the margin of the copy of the mortgage on the record. That credit left due on the mortgage $2,500, and for that amount Carwile drew a draft for J. W. Barr to sign (bearing date March 3) on Warren, Wallace & Co. in favor of Quattlebaum, who on the next day, March 4, went to Augusta and received the money, and on the

4

next day, March 5, J. W. Barr executed to Warren, Wallace & Co. a mortgage to secure that loan of the very land which had been embraced in the Quattlebaum mortgage.' The formal part of this mortgage, all but the amount, was also in the handwriting of Carwile. The original note of J. W. Barr to Quattlebaum was also credited with the fifty-one hundred dollars as of March 1, 1873, but the figure 1 was evidently written over the figure 3. Across the face of the copy mortgage on the record is written in large letters "Set," as if the first syllable of the word "Settled,". and the principal question in the case was, whether or not the draft of March 3 for $2,500, paid by Warren, Wallace & Co. to Quattlebaum, was the payment in full of the note and mortgage of Quattlebaum, to clear the way for that of Warren, Wallace & Co., and the former should have been at that time marked "settled."

On January 28, 1874, J. W. Barr executed and delivered to one Samuel Baker an absolute conveyance of the premises for the consideration expressed of $10,000. The said Baker, as it afterwards appeared, at the same time executed to J. W. Barr a bond to reconvey the land upon the payment of $1,500, which was really the money then due on a subsisting debt. The deed was put on record regularly, but the defeasance was not.

On April 17, 1874, J. W. Barr confessed judgment to Jennings, Smith & Co. for something over $3,000, and soon after other judgments were entered against him in favor of Robinson, R. H. May & Co., et al. In June, 1883, J. W. Barr was still living on the premises, and when Jennings, Smith & Co. endeavored to enforce their judgment, he claimed homestead in the land, but at the time the commissioners went to lay it off, he disclaimed the ownership of any real estate, saying that he had sold and conveyed the land to Samuel Baker, &c.

On August 6, 1883, the interest of J. W. Barr in the premises was sold by the sheriff under executions in his office [1] and purchased by J. W. Tompkins, who took sheriff's title, and commenced an action for possession against J. W. Barr, when O. O. Barr, his son, had himself made a party defendant, and claimed

[1] It appears in the "Brief" that at this sale notice was given that the Quattlebaum mortgage was unpaid.—REPORTER.

that he was the owner of the premises and in possession thereof under a deed from the representatives of the said Samuel Baker, who in the meantime had died; and besides, that he had an interest as assignee in the Quattlebaum mortgage to the amount of $1,593.41, money alleged to have been paid by him to Quattlebaum in part payment of a contract to purchase the mortgage. In this action there was at first a verdict for the defendant, but Judge Aldrich ordered a new trial, and upon the second trial there was a verdict for the plaintiff.

While this action of J. W. Tompkins against J. W. Barr and O. O. Barr was pending on the law side of the court, the plaintiff, Quattlebaum, a brother-in-law of J. W. Barr, instituted these proceedings on the equity side of the court to foreclose upon the premises the old mortgage of 1872, alleging that there was still due the original sum of $7,500, "less the sum of fifty-one hundred dollars paid on the 1st day of March, 1873." The complaint admitted that O. O. Barr had paid plaintiff, at two different times, some money on the mortgage, but claimed that he, the plaintiff, "is the lawful owner and holder of the said note and mortgage." The complaint also merely suggested that J. W. Tompkins and O. O. Barr (the other persons named were stricken from the record) "claimed an interest in the land," &c., and prayed judgment of foreclosure.

J. W. Barr answered, merely echoing the statements and prayer of the complaint. O. O. Barr did the same, with the addition of making claim that he was substantially assignee of the mortgage to the extent, at least, of the payments made by him to Quattlebaum; and again reiterating his claim to the premises under the deed of his father to Baker and thence to him. J. W. Tompkins answered, alleging and charging that the Quattlebaum mortgage had been paid in full, and should have been marked satisfied, when the record was credited with $5,100 on the first of March, and the balance of $2,500 was paid on March 3, by the draft on Warren, Wallace & Co.; and, also, that "the pretended contract of the plaintiff with O. O. Barr, as to transferring a part of the mortgage to him, was collusive and fraudulent, and the allegation was made for the purpose of defeating, delaying, and hindering the just creditors of J. W. Barr," &c.

It was referred to E. A. Glover, Esq., as special referee, to take the testimony and ascertain the priorities of the different liens against J. W. Barr. There was much testimony, including the records in the homestead proceedings and in the action of ejectment of J. W. Tompkins against J. W. Barr and O. O. Barr for this same land, which is all in the "Brief" and may be referred to as occasion requires. The cause came on to be heard by Judge Cothran, who considered that there were involved three questions: first, was the Quattlebaum mortgage paid off and satisfied by J. W. Barr? second, if not, has O. O. Barr acquired an enforcible interest in it, by reason of payments made on his father's account, to the extent of such payments? and, third, should the Baker claim set up by O. O. Barr be sustained? Upon the evidence, the judge held adversely upon the second and third questions, disallowing the claims made in them respectively. But as to the first, he held, with some hesitation, that the mortgage debt was not paid in full on March 3, 1873, when J. W. Barr's draft on Warren, Wallace & Co. was given for what was represented to be, and really appeared to be, the balance in full of the mortgage debt. This was held, as the judge says, "against his earlier and strong impressions," upon the force of the testimony of the plaintiff himself and of J. W. Barr, to the effect that the draft for $2,500 upon Warren, Wallace & Co., of date March 3, had been in fact, by anticipation, included in the receipt for $5,100 two days before, on March 1, entered on the mortgage, and also on the margin of the record in the register's office, and also on the note.

The Judge says: "The evidence to show payment, both circumstantial and recorded, is very strong, but I cannot say that it is sufficient to prevail against the most direct and positive assertions of parties whose character for veracity has not been questioned, and who, of all others, being the payee and payer of the debt in question, must have best known the fact. But suppose they are not mistaken, and that only $5,100 was paid—it is insisted that such conclusion must, upon obvious principles well recognized in the administration of justice, be excluded.  *  *  *  It may be that in his eagerness to get the $2,500, Quattlebaum was willing to say, and Barr to assent to it, that $5,100 had been paid, and

that he would trust his debtor, a brother-in-law, to make it all right, and this not having been done as yet, consists with their assertions that only $5,100 was paid in all by J. W. Barr on the mortgage, and this would reconcile much conflicting testimony in the case. The real question thus presented is, does this amount to an estoppel? for it is familiar law, and goes without the citation of authorities, that parol evidence is admissible to explain the terms of a receipt in writing, and there is nothing more than that. And although iterated and reiterated, it remains but a receipt still, &c. Technically speaking (for all law is technical, and that of estoppel is especially so), I am forced to contend [conclude] that this is not a case for the application of the doctrine. It is very nearly such, but one of the essential qualities to make out an estoppel is fatally wanting, and that is privity between the defendant, Tompkins, and Warren, Wallace & Co., whose agent was imposed upon by Quattlebaum and J. W. Barr in the transaction at Edgefield on March 3, 1873," &c. From this decree both parties appealed.

EXCEPTIONS OF J. W. TOMPKINS.—I. "Because the Circuit Judge erred in concluding that the acknowledgment of a credit of $5,100 was entered on the margin of the registered mortgage by Quattlebaum on the 3d day March, 1873, and in concluding that said entry was made at the time of the entry on the original mortgage in the handwriting of Carwile.

II. "Because his honor erred in holding that it was competent for the plaintiff, Quattlebaum, to deny and falsify his acknowledgment of the receipt of $5,100, the same having been acknowledged by him four times in writing, and at three different times, viz.: 1st. On the margin of the record in the register's office. 2d. On the note and mortgage; and, 3d. In the allegation of his complaint, after the same had been proved by all the answers admitting the same, thereby falsifying the records of the court, viz., the record in the register's office and his own complaint.

III. "Because his honor erred in concluding and decreeing that the plaintiff, Quattlebaum, is entitled to have payment for any sum on said mortgage debt.

IV. "Because his honor erred in not holding that said mort-

gage and debt had been paid in full, and ordering the same marked settled and cancelled.

V. "Because his honor erred in not directing the overplus arising from the sale of the land in question, after satisfying the mortgage debt of Quattlebaum, should be paid directly to the defendant, J. W. Tompkins, he having title to said premises, and being the assignee of the judgments against J. W. Barr."

EXCEPTIONS OF O. O. BARR.—I. "Because his honor erred in deciding that the payments made by O. O. Barr to R. H. Quattlebaum of $348.09 and $1,245.32, made on October 27, 1879, and December 27, 1870, respectively, were made with the funds of J. W. Barr.

II. "Because his honor erred in refusing to allow the said O. O. Barr judgment for the amounts paid Quattlebaum as aforesaid, in the foreclosure of the mortgage set forth in the complaint herein.

III. "Because his honor erred in deciding that the money paid by O. O. Barr to Samuel Baker and to his administrator and heirs at law, was derived from the property of J. W. Barr.

IV. "Because his honor erred in deciding that if the said payments made on the Baker claim were made with the money of O. O. Barr, that the said payments were a contrivance on his part to defeat the creditors of his father, J. W. Barr.

V. "Because his honor erred in refusing to allow O. O. Barr judgment for the amounts of the said payments made by O. O. Barr on said Baker claim.

VI. "Because his honor erred in deciding that the circumstances enumerated in said decree tended 'but too plainly to show on the part of the Barrs repeated and most desperate efforts to defraud, delay, and defeat the just claims of creditors.'

VII. "Because his honor erred in deciding that the claims set up by O. O. Barr were fraudulent as to creditors of J. W. Barr, when no such issue was presented in the pleadings or properly before the court."

The claim of O. O. Barr, known as the "Baker claim," originated in the deed of J. W. Barr to Samuel Baker, bearing date January 28, 1874, and really we cannot see how it can be properly adjudicated in this case. This is an action for the simple

and single purpose of foreclosing the Quattlebaum mortgage, in which the plaintiff impleaded not only the mortgagor, J. W. Barr, but also O. O. Barr and J. W. Tompkins, on the vague ground that they "claim an interest in the land." The interest claimed by Tompkins is as purchaser of the land under junior judgments against the mortgagor, J. W. Barr, and he antagonized the foreclosure of the Quattlebaum mortgage. But O. O. Barr set up no interest adverse to that of the plaintiff, Quattlebaum; but, on the contrary, he joined in the prayer for foreclosure. The interest which he claimed in the land made an issue only with his co-defendant, Tompkins. By the rules of pleadings a defendant is required to answer the allegations of the complaint, but not those of the answer of a co-defendant, of which he may be ignorant.

It is true that the Court of Equity may decree between co-defendants; but the limit to the power is laid down by Lord Redesdale in the case of *Chalmey* v. *Lord Dunsany* (2 *Sch. & Lef.*, 710), and approved by our own court in *Mott* v. *Schult* (1 *Hill Ch.*, 145), where it is said that "the Court of Equity may decree between co-defendants, but it must be on evidence arising from pleadings and proofs between plaintiffs and defendants." Now, in this case, if we regard O. O. Barr, the assignee of the Baker claim, as substantially a junior mortgagee, and as such a proper party to the action, it was not alleged in the complaint that he was such mortgagee, and therefore Tompkins had no opportunity to contest that claim. If there had been a distinct allegation in the complaint to that effect, the defendant, Tompkins, would have had an opportunity to contest. As stated, there was only a vague allegation in the complaint, which was not notice to Tompkins. The claim as mortgagee first appeared in the answer of O. O. Barr, and therefore it seems to us that the question of the validity of Barr's claim as mortgagee was not properly in issue before the court, and should not have been considered or adjudged.

Then the question in the case is, whether the mortgage was satisfied on March 3, 1873, and should have been so marked. We agree with the Circuit Judge that "the evidence tending to show payment, both circumstantial and recorded, is very strong."

It is certain that if the facts were as represented, the whole mortgage debt was paid on that day, for there was on the margin of the recorded mortgage an acknowledgment of the mortgagee that $5,100 had been paid two days before, on March 1, and on that day, March 3, a draft was drawn and delivered for what appeared to be the exact balance, $2,500. It would seem that the official certificate of satisfaction might have been then and there entered, as indeed was contemplated, as shown by the entry across the record of the large letters "Set," which was probably the first syllable of the word "Settled," left incomplete for the moment, it may be, for the reason that the draft then given was not actually paid.

There are many circumstances which support this view, and among them the acts of the parties themselves. Up to this transaction in the register's office, the mortgagee, Quattlebaum, had not shown himself remiss in seeking payment of his debt; but from that time (1873) he seems to have made no effort to enforce his mortgage for any balance which might be due, until Tompkins sued his mortgagor for the land in 1883, a period of ten years, although during that time his mortgagor had not only mortgaged the same land to Warren, Wallace & Co., but had sold and conveyed it by an absolute deed to Samuel Baker, and, becoming deeply involved, had been sold out by the sheriff. If there was a balance still due, as alleged, on his debt, it is difficult to understand why Quattlebaum should have remained inactive even after his mortgagor had sold and conveyed the land covered by his mortgage. But both the creditor, Quattlebaum, and the debtor, Barr, testified positively before the referee that the representations made by the parties, and placed on the record on March 1, 1873, were not true ; that the amount of money which had been actually paid was not $5,100, but $2,600, the difference being made up by including in anticipation the amount of the draft on Warren, Wallace & Co., not given until two days after, on March 3.

It is always desirable, if it can be done, to take such view as consists with the testimony of witnesses, whose character for truthfulness has not been impeached. Assuming, then, that the statement now made, although in conflict with the facts as repre-

sented in 1873, is true, the question is whether they are estopped from falsifying their own representations as then committed to writing and placed on the record. We suppose, if Warren, Wallace & Co. were before the court enforcing their mortgage, there could not be the least doubt that the parties would not be heard to contradict the acknowledgment on the registry of $5,100 on March 1, for the very good reason that it was upon the faith of that representation that W., W. & Co. acted in advancing $2,500 to satisfy the balance of the debt, and in taking a mortgage of this same land to secure it. · Carwile testified that "this draft ($2,500) was given for the purpose of getting money to settle the mortgage that Quattlebaum had against Barr. I think that this money is no part of the first credit of $5,100, the acknowledgment of which I have said was in my handwriting. I am satisfied that it is no part of it. I was at the time the authorized agent of Warren, Wallace & Co.; I never had any instructions from them to take mortgages on any encumbered property, but to take unencumbered property. As their agent I would not have negotiated a loan from them to J. W. Barr, if I had thought the property was encumbered." Mr. John W. Wallace, connected with the firm of Warren, Wallace & Co., testified that "the $2,500 was to relieve the property from the mortgage of Quattlebaum, which would free the premises from all liens. And to our knowledge this Quattlebaum mortgage was the only encumbrance on the place. If there had been any other, we certainly would not have advanced the money. The funds advanced by the firm of Warren, Wallace & Co. to Barr, was for no other purpose than to satisfy the Quattlebaum mortgage," &c. So that it is perfectly clear that Warren, Wallace & Co. were imposed upon to their injury by the representations of March 1, 1873, in writing and on record.

It is, however, urged that J. W. Tompkins is not in privity with Warren, Wallace & Co., and therefore is not entitled to the estoppel which clearly exists as to them; that as Tompkins does not hold under Warren, Wallace & Co., the aforesaid misrepresentations in their effect do not reach to Tompkins, but as to him they were nothing more than an ordinary receipt between creditor and debtor, which, under the law, may be explained or even

contradicted. This point is certainly not free from difficulty. It is undoubtedly true, that generally a mere receipt for money is not conclusive between the parties; but it seems to us, that in this respect, there may be a difference between a simple receipt for money on a note, and a receipt on a mortgage deed of land, especially when the acknowledgment is entered on the registry of the deed, thereby giving notice of the fact to the world, and partaking somewhat of the nature of satisfaction of the lien. There is such a thing as privity in estate. True, Tompkins does not hold under Warren, Wallace & Co., but he does hold the land, in reference to which (or to a lien on it) the misrepresentation was made. Whatever touches the existence of a lien on land, must affect the interest of a purchaser of that land. Suppose, instead of $5,100, the acknowledgment had been of the whole debt and interest; whether true or false, it would have been the duty of the register to enter satisfaction on the mortgage, which would have cancelled the lien as to all the world. If so, does it not follow that the acknowledgment on the record of the receipt of $5,100 was, in effect, satisfaction of the mortgage to that extent?

As was said in *Wood* v. *Seely*, 32 *N. Y.*, 105: "Estoppels by record or by deed, as is well known, run in favor of and against the privies in estate of the immediate parties to the estoppel, as well as for and against the parties personally; and I see no reason why estoppels in pais should not be within the rule, as they clearly are within its principle. Cases of dedication often rest upon the principle of estoppel in pais, it being considered fraudulent on the part of one dedicating his land to public uses, to retract to the prejudice of parties who have purchased on the faith of such dedication. It has frequently been held that the estoppel attaches itself to the land and can be asserted on behalf of the grantee of the immediate purchaser," &c. *Big. Estop.*, 449. The acknowledgment on the registry was a continuing representation to all concerned, and must be considered as made, not only to Warren, Wallace & Co., but to any one who might purchase the land. Ignorance of the true state of facts, still wrapped up in the breast of the parties, placed Tompkins in a position somewhat analogous to that of a purchaser for valuable

consideration without notice.  It will be found, upon a careful examination of the authorities, that wherever the rights of other parties have intervened by reason of a man's conduct, he will then not be permitted to disturb the state of things, whatever may have been his rights at first.  See *Big. Estop.*, 508, and notes.

But if we are mistaken in this, and the acknowledgment on the record should be regarded merely as a "receipt in parol" for so much money on the note, we do not think it necessarily follows that the parties now must be heard to contradict it.  The rule that a receipt is not conclusive between the parties is not without exceptions.  From the peculiar nature of the transactions, it has been held not to apply to warehouse receipts and for premiums upon a policy of marine insurance, and some others.  Mr. Bigelow states the doctrine as follows : "The general rule that an acknowledgment of receipt in a sealed instrument may be controverted, is, we apprehend, only a rule of interpretation, and not an arbitrary doctrine of the law, even in cases where there are no extraneous circumstances to make the admission binding.  There is no reason why the parties should not be able to agree that there shall be no disputing the admission ; and if the parties should, by apt terms in the instrument, promise not to question the receipt, the courts could not fail to consider the acknowledgment as binding."  *Bigelow*, p. 284, and notes.

Now, we think there are "extraneous circumstances in this case to make the admission binding."  The single fact that the receipt was not only entered on the note and the mortgage, but acknowledged on the registry, shows that it was intended to be something more than a simple receipt for so much money, which appeared abundantly by the endorsements on the note and mortgage.  It is not usual to enter receipts in part payment of a note upon the record of the mortgage given to secure it.  Ordinarily the record is not touched unless to make some entry looking towards satisfaction.  The note is for the debt, and the mortgage is a lien upon property to secure it.  It appears that the entry on the record was made at the instance of Mr. Carwile, who was there for the very purpose of clearing the office of all liens, in order to make way for the mortgage to be given. to

Warren, Wallace & Co. ; and it would seem that the object of the parties in making the entry on the record was to clinch the matter and make it an absolute verity, beyond all possible doubt or future cavil.   Whatever may have been the understanding or the rights of the parties as between themselves, this was their solemn declaration made on the public registry, and it seems to us that they thereby estopped themselves from now retracting it; and that to allow them to withdraw or qualify it now, after the land mortgaged has been transferred to another, would operate as a fraud upon rights which have been acquired upon the faith of it.

This view of the main question makes it unnecessary to consider whether the defendant, O. O. Barr, had an enforcible interest in the mortgage.

The judgment of this court is, that the judgment of the Circuit Court as to the claim of O. O. Barr be set aside without prejudice ; and that the judgment as to the mortgage of Quattlebaum be reversed, and the complaint dismissed.